**SUPER TIRE ENGINEERING COMPANY et al., Appellants,**

v.

**Lloyd W. McCORKLE, Commissioner of the Department of Institutions and Agencies of the State of New Jersey, et al., Appellees.**

**Nos. 71–1773, 71–1774 and 71–1775.**

United States Court of Appeals, Third Circuit.

Argued Sept. 14, 1972.

Decided Nov. 22, 1972.

---

Herbert G. Keene, Jr., Stradley, Ronon, Stevens & Young, Philadelphia, Pa., for appellants.

Robert F. O'Brien, Plone, Tomar, Parks & Seliger, Camden, N. J., and Virginia Long Annich, George F. Kugler, Jr., Atty. Gen. of N. J., Trenton, N. J., for appellees.

Before McLAUGHLIN, ADAMS and GIBBONS, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

In this case, appellants claim three New Jersey welfare programs [1] that provide benefits to certain striking workers, violate the federal constitution, federal statutes and state statutes. Appellants,[2] alleging that their em-

---

1. There has been considerable confusion over which welfare programs New Jersey currently operates. From oral argument and subsequent memoranda it appears that appellants are challenging the following three programs: Aid for Dependent Children (A.F.D.C.), N.J.S.A. 44:10–1 et seq., a joint state-federal program; Aid to Families of the Working Poor, N.J.S.A. 44:13–1 et seq., a state program; General Public Assistance, N. J.S.A. 44:8–107 et seq., a state program.

2. Appellants, Super Tire Engineering Company and Supercap Corporation, are New Jersey corporations; appellant, A.

ployees while engaged in an economic strike received aid under the challenged programs, sought an injunction restraining various New Jersey officials, appellees here,[3] from continuing to provide payments to the workers under these programs.

It is forcefully contended that these welfare programs directly interfere with free collective bargaining, a federal policy enunciated in the labor acts, 29 U.S.C. §§ 157–158, and are unconstitutional because they contravene the Supremacy Clause of the U.S. Constitution. They further assert that the inclusion of striking employees in the programs abridges the federal statute under which one of the programs is funded,[4] and the New Jersey statutes pursuant to which the state officials have promulgated regulations affecting striking employees.[5]

Critical to our disposition of the case, is the sequence of events. On May 14, 1971, at the conclusion of a three-year contract, negotiations having been to that point unfruitful, the employees began an economic strike. Shortly thereafter, as the employers allege, certain of the employees sought public assistance under one of these welfare programs.

On June 10, 1971, the complaint giving rise to this litigation was filed, and on June 14 the District Court ordered that a hearing on the request for a preliminary injunction be held on June 24.[6] At that hearing the state officials and the union moved to dismiss the employers' complaint pursuant to Rule 12(b)(6), F.R.Civ.P. The trial judge, persuaded by ITT Lamp Division v. Minter, 435 F.2d 989 (1st Cir. 1970), cert. denied, 402 U.S. 933, 91 S.Ct. 1526, 28 L.Ed.2d 868, rehearing denied, 404 U.S. 874, 92 S.Ct. 27, 30 L.Ed.2d 120 (1971), on July 13 dismissed the complaint and the motion for a preliminary injunction.

The union states that the strike "ended immediately prior to the June 24, 1971 hearing." The employers allege that the "employees did not return to work until June 28, 1971." Under either factual situation, a new contract having been accepted and ratified,[7] it is clear that the labor dispute undergirding this challenge to the New Jersey programs had been concluded before the trial judge dismissed the action and long before appeals were filed or argued in this Court.

Robert Schaevitz, is a citizen of and taxpayer of New Jersey, as well as president and chief executive officer of appellant corporations.

3. The Teamsters Local Union No. 676, the certified collective bargaining representative for all production and maintenance employees of the corporate-appellants, was granted permission by the District Court to intervene on behalf of the defendant-appellees.

4. A.F.D.C. is a joint federal-state program created by § 402 of the Social Security Act, 42 U.S.C. § 602.

5. The question whether the regulations governing each of the programs comport with the New Jersey statute under which they are promulgated is one of state law. Resolution of that issue might render unnecessary a decision on the basic constitutional challenges. In such circumstances, it is normally the duty of federal courts to abstain, awaiting a definitive pronouncement from a state court on questions of state law. We do not address this issue because it would not be reached until the Court determines that the case is within its jurisdiction. Railroad Commission v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

6. The jurisdiction of the District Court was alleged to be grounded on 28 U.S.C. § 1331 and § 1337. The applicability of § 1337 need not be discussed, for, it appearing that the amount in controversy exceeds $10,000., jurisdiction can be based on § 1331.

7. At the hearing before the District Court on plaintiffs' motion for a preliminary injunction, the transcript of which appears at pages 52a–72a of the appendix filed by plaintiff-appellants, counsel for the plaintiffs stated:
". . . the strike was ended as of yesterday in that our latest contract was ratified by the Union Membership yesterday and they plan a return to work tomorrow." Appendix at 65a.

Although many important questions of law have been ably argued and briefed by both sides, it now appears to this Court that the resolution of the underlying labor dispute raises squarely the issue of mootness.

## I.

■ Article III of the Constitution commands that the federal judicial power shall extend only to cases and controversies. Thus, lacking a case or controversy, the federal courts are without jurisdiction. In North Carolina v. Rice, 404 U.S. 244, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971), the Supreme Court states explicitly that mootness is an Article III jurisdictional issue, setting forth the fundamental considerations:

"Although neither party has urged that this case is moot, resolution of the question is essential if federal courts are to function within their constitutional sphere of authority. Early in its history, this Court held that it had no power to issue advisory opinions, Hayburn's Case, 2 Dall. 409, 1 L.Ed. 436 (1792), as interpreted in Muskrat v. United States, 219 U.S. 346, 351–353, 31 S.Ct. 250, 55 L.Ed. 246 (1911), and it has frequently repeated that federal courts are without power to decide questions which cannot affect the rights of litigants in the case before them. Oil Workers Unions v. Missouri, 361 U.S. 363, 367, 80 S.Ct. 391, 4 L.Ed.2d 373 (1960). To be cognizable in a federal court, a suit 'must be definite and concrete, touching the legal relations of parties having adverse legal interests. . . . It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.' Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240–241, 57 S.Ct. 461, 81 L.Ed. 617 (1937). However, '[m]oot questions require no answer.' Missouri, Kansas & Texas R. Co. v. Ferris, 179 U.S. 602, 606, 21 S.Ct. 231, 45 L.Ed. 337 (1900). Mootness is a jurisdictional question because the Court 'is not empowered to decide moot questions or abstract propositions,' United States v. Alaska S. S. Co., 253 U.S. 113, 116, 40 S.Ct. 448, 64 L.Ed. 808 (1920), quoting California v. San Pablo & Tulare R. Co., 149 U.S. 308, 314, 13 S.Ct. 876, 37 L.Ed. 747 (1893); our impotence 'to review moot cases derives from the requirement of Article III of the Constitution under which the exercise of judicial power depends upon the existence of a case or controversy.' Liner v. Jafco, Inc., 375 U.S. 301, 306 n. 3, 84 S.Ct. 391, 11 L.Ed.2d 347 (1964). See also Powell v. McCormack, 395 U.S. 486, 496 n. 7, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). Even in cases arising in the state courts, the question of mootness is a federal one which a federal court must resolve before it assumes jurisdiction. Henry v. Mississippi, 379 U. S. 443, 447, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965). Liner v. Jafco, Inc., supra, 375 U.S. at 304, 84 S.Ct. 391." 404 U.S. at 246, 92 S.Ct. at 404.

Beyond these dictates, however, broad statements about mootness suffer the same infirmity as general discussions about most abstruse subjects.[8] Though mootness is a constitutional problem, an articulation of the specific parameters of the doctrine has never been assayed by the Supreme Court.[9] Rather, the doctrine of mootness is protean in nature, assuming different shapes at different times. Indeed, the recent cases

---

**8.** In Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), Justice Douglas ascribed to discussions of standing a quality equally applicable to discussions of mootness. "Generalizations about standing to sue are largely worthless as such." *Id.* at 151, 90 S.Ct. at 829.

**9.** *See generally*, Note, Mootness on Appeal in the Supreme Court, 83 Harv.L.Rev. 1672 (1970); Note, Cases Moot on Appeal: A Limit on the Judicial Power, 103 U.Pa.L.Rev. 772 (1955).

confronting the issue would appear not to produce a unitary, coherent line.

The problem of mootness presents a recurring refrain in several types of cases. Analysis of them reveals four concerns that the Supreme Court addresses in terms of mootness. They are: that some sort of judicial decree be possible, that the parties remain in a posture sufficiently adverse to insure effective litigation, that the issue in contention continue to be concrete, and that the issue not be one that will recur and yet be unreviewable. Beyond these observations, however, conclusions become difficult. This difficulty is at least in part attributable to the proximity of mootness to several other justiciability precepts, and the tendency of courts to become unclear as to just which doctrine is applicable. For example, the concern with sufficient adversity is related to the question of "standing," and the fear regarding loss of concreteness approaches ripeness. Further beclouding the problem is the seeming congruence, at times, of the jurisdictional requirements for declaratory judgments and the mootness doctrine. See e. g., Golden v. Zwickler, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969). In spite of the impediments involved in attempting to draw conclusions about the content of the mootness doctrine, the resolution of this case requires that the concerns to which mootness responds be developed.

The early mootness cases were bottomed on the Court's unwillingness to act unless it could issue a decree that would affect the legal rights of the parties to the litigation. There frequently was no discussion of the underpinning of the concept, but it is clear that the Court considered that the phrase "judicial power" encompassed situations only in which an effective decree could be rendered, or that such a situation was not a "case" or "controversy." In Singer Manufacturing Co. v. Wright, 141 U. S. 696, 12 S.Ct. 103, 35 L.Ed. 906 (1891), a Georgia tax was alleged to discriminate impermissibly between two classes of retailers. Singer brought suit to enjoin collection of the tax as levied against it. Before the appeal reached the Supreme Court, Singer, still pursuing the litigation, paid the tax. Although acknowledging that an action for restitution, which would raise the same issues, might lie, the Supreme Court dismissed the case as moot because nothing remained to be enjoined. See, Commercial Cable Co. v. Burleson, 250 U.S. 360, 39 S.Ct. 512, 63 L.Ed. 1030 (1919). See generally, Note, Mootness on Appeal in the Supreme Court, 83 Harv.L.Rev. 1672, 1674–5 (1970).

Much of the recent motion in the mootness field has occurred in cases involving convicted criminals who have been released from prison. The leading cases, separated by twenty-five years, illustrate the Court's shift from emphasis on an effective decree to a more functional approach in the context of a criminal situation, looking for sufficient interest and adversity between the parties. Both St. Pierre v. United States, 319 U. S. 41, 63 S.Ct. 910, 87 L.Ed. 1199 (1943), and Sibron v. New York, 392 U. S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), were challenges brought by persons whose prison terms had been completed. In St. Pierre, the court dismissed as moot, stating:

"On the argument it was conceded that petitioner had fully served his sentence before certiorari was granted. We are of opinion that the case is moot because, after petitioner's service of his sentence and its expiration, there was no longer a subject matter on which the judgment of this Court could operate. A federal court is without power to decide moot questions or to give advisory opinions which cannot affect the rights of the litigants in the case before it. United States v. Alaska S. S. Co., 253 U.S. 113, 115–116, 40 S.Ct. 448, 64 L.Ed. 808, and cases cited; United States v. Hamburg-American Co., 239 U.S. 466, 475–477, 36 S.Ct. 212, 60 L.Ed. 387." 319 U.S. at 42, 63 S.Ct. at 911.

See Parker v. Ellis, 362 U.S. 574, 80 S.Ct. 909, 4 L.Ed.2d 963 (1960). Sib-

*ron,* however, was not held to be moot because, as the Court asserted, the brevity of the sentence made review before release impossible, and the enduring effects of the conviction assured that Sibron would diligently litigate the question, and in a concrete factual context. *See* Mancusi v. Stubbs, 408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972). A lack of concreteness seemed the motivation for a finding of mootness in North Carolina v. Rice, *supra. See* Aikens v. California, 406 U.S. 813, 92 S.Ct. 1931, 32 L.Ed.2d 511 (1972).

Another group of cases includes those in which something other than the passage of time creates the mootness problem.[10] This class of case involves changed circumstances or voluntary cessation of a questioned activity. Thus, changing conditions have at times led to an invocation of the mootness doctrine. In Two Guys From Harrison-Allentown, Inc. v. McGinley, 366 U.S. 582, 81 S.Ct. 1135, 6 L.Ed.2d 551 (1961), the enactment of an amendment to a Sunday-closing statute, plus the election of a new prosecutor were held to moot an assault on the "Blue Laws." In Golden v. Zwickler, *supra,* Zwickler, was challenging a New York statute prohibiting the distribution of anonymous handbills. The handbills he desired to distribute attacked Congressman Multer, an incumbent running for reelection in 1964. Before the case was heard by the U.S. Supreme Court, Multer had become a Justice of the Supreme Court of New York. His target thus having been removed from active politics and unlikely to reappear, Zwickler's appeal was held not to be justiciable any longer.[11] These two cases exemplify the Court's concern both with the concreteness of the controversy and the continuing adverse nature of the parties. The same elements seem to be

operative in SEC v. Medical Committee for Human Rights, 404 U.S. 403, 92 S. Ct. 577, 30 L.Ed.2d 560 (1972), where the ruling of the Commission that Dow need not include an anti-napalm proposal in its 1968 proxy solicitations was held no longer reviewable. The finding of mootness was based on Dow's voluntary inclusion of the proposal in its 1971 solicitation, the less-than-3% support that the proposal received at that time, and SEC regulations which permitted Dow to delete for three years a proposal with such limited support.[12]

The most frequently quoted cases of the voluntary cessation type are United States v. W. T. Grant & Co., 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953) and United States v. Trans-Missouri Freight Assn., 166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007 (1897). Both involved conduct by defendants claimed to be in violation of the antitrust laws. The defendants, in each case, ceasing the allegedly illegal activity, urged that the proceedings brought by the government had thus become moot. In each case the Court, looking to the public interest in enforcement of the antitrust law, and the possibility that the defendants might repeat the questioned activity, held that the cases were not moot. The decisive considerations in *Grant* and *Trans-Missouri* are not as clear as in some other mootness cases. Nevertheless, the interest of the government in seeing that its laws not be evaded by the practice of ceasing questioned activity when challenged, assure that the government will be an active litigant. The fact that the questionable activity was being conducted at the start of the litigation appeared to aid the Court by providing a concrete controversy. *See* United States v. Concentrated Phosphate Export Assn., Inc., 393 U.S. 199 (1968).

---

**10.** Cases dealing with elections that have taken place, orders that have expired before review, and injunctions that have lapsed, discussed *infra,* are a third type of case in which mootness occurs.

**11.** As discussed earlier, Golden v. Zwickler, *supra,* is not technically a mootness

case but one posing a problem under the Declaratory Judgment Act. Nevertheless, it is frequently cited as a mootness case.

**12.** *See* Johnson v. New York State Educ. Dep't, 405 U.S. 916, 92 S.Ct. 986, 30 L. Ed.2d 785 (1972).

Another line of cases dealing with mootness is comprised of those in which the passage of time has caused the immediate object of the litigation to become unobtainable. Typical are disputes that in some way challenge election laws. In these cases a private citizen is the plaintiff and the government is the defendant. The mootness problem arises because the election has passed. Three cases in which this issue appeared have been held moot, Brockington v. Rhodes, 396 U.S. 41, 90 S.Ct. 206, 24 L.Ed.2d 209 (1969); Hall v. Beals, 396 U.S. 45, 90 S.Ct. 200, 24 L.Ed.2d 214 (1969); and Socialist Labor Party v. Gilligan, 406 U.S. 583, 92 S.Ct. 1716, 32 L.Ed.2d 317 (1972). *Brockington* was a suit brought by a would-be candidate for Congress seeking a writ requiring the election board to list his name on the ballot, a step the board had refused to take since the nominating petitions filed by the aspirant were short of the required number of signatures. The Supreme Court stated that because the election was passed, the case was moot since the only relief sought was now unavailing. *Brockington* would appear to be a return, perhaps anachronistically, to the "effective decree" standard.

*Hall* was a challenge to Colorado's six-month residency requirement for voting. An amendment to the statute reducing the requirement to two months, and the passage of the election were held to moot the appeal. Since the amendment reducing the residency requirement would have permitted the plaintiffs to vote, and, they would be eligible to vote in the next election, this case is perhaps explained as a decision based on a lack of adversity.

In *Socialist Labor Party* the statute attacked as unconstitutional was amended, correcting many of the infirmities that had been alleged by the plaintiffs. The Socialist Labor Party attempted to keep their suit alive by pointing to an unamended oath provision. The Court, finding that the heart of the suit had been removed, refused to permit it to be pursued on this tangential issue.[13]

A greater number of cases wherein the election has passed have been held not moot. In Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963), Georgia's county-unit primary system was assailed. Though the use of the specific system had been enjoined in the district court, and the Democratic Party, whose primary was the one challenged, actually held the election on a popular basis, the Supreme Court did not find the case moot. The Court stated two reasons for proceeding to the merits. First, the district court's injunction regulated only the present election, and dismissal of the case would restore Georgia to the *status quo ante,* i. e., able to conduct future elections under the county-unit system. Second, citing United States v. W. T. Grant, *supra,* the Court held that the Democrats' voluntary abstention from the challenged activity did not guarantee such restraint in the next election. Though nowhere so articulated, this approach indicates that if the activity controverted is imbedded in a statute, rendering high the probability of repetition, and the complainants will suffer with each repetition, then there is sufficient adversity. *See* Bullock v. Carter, 405 U.S. 134, 141 n. 17, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972). *See generally* Note, 83 Harv.L.Rev. at 1684–5.[14]

13. Similar to *Socialist Labor* is Diffenderfer v. Central Baptist Chuch, 404 U.S. 412, 92 S.Ct. 574, 30 L.Ed.2d 567 (1972). In *Diffenderfer,* the tax-exemption accorded a church-owned parking lot under a Florida statute was questioned. After the statute was amended, the appeal reached the Supreme Court, which held that it would not decide speculative questions about the new statute, and that the matter was not moot. Both these

cases thus seem to indicate that the Court will not act when the main issue has been resolved and only an incidental issue remains to be decided.

14. The Court in three recent election situations has held not moot cases on appeal after the election has passed. In Fortson v. Toombs, 379 U.S. 621, 85 S.Ct. 598, 13 L.Ed.2d 527 (1965), another case arising from Georgia, the Court vacated

A final series of cases introduces another element into the mootness doctrine. These cases are brought by parties who suffer injury from the effects of a short-lived government order. The Supreme Court has stated that if the impact of such order will always pass before review is possible, then the case is not moot, for a finding of mootness would foreclose any possibility of review. The progenitor of this type of suit is Southern Pacific Terminal Co. v. ICC, 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911). ICC had ordered Southern Pacific to cease giving preferences to certain shippers, the order to continue for two years. Southern Pacific's appeal from the order was not heard by the Supreme Court until after the two-year provision of the order had ended. Holding the case not moot, the Court stated that a finding of mootness would create a class of situations in which, because of the short duration of the directive, the government could engage in actions "capable of repetition, yet evading review." 219 U.S. at 515, 31 S.Ct. at 283.

Recent cases have relied on this doctrine. In Moore v. Ogilvey, 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969), the petitioners had raised a challenge to an Illinois requirement that a potential nominee amass signatures in fifty counties. Citing *Southern Pacific,* the Court held that this case was justiciable, though the election had passed, for if the 50-county requirement were not tested, there would be a high degree of certainty that it would continue to be controlling from election to election. The same considerations preserved the justiciability of an attack upon a Tennessee residency-for-voting requirement in Dunn v. Blumstein, 405 U.S. 330, 333–334, 92 S. Ct. 995, 31 L.Ed.2d 274 n. 2 (1972).

In Carroll v. President and Commissioners of Princess Anne County, 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968), the prevention of potentially inflammatory "white supremacist" rallies by a ten-day injunction was on appeal in the Supreme Court. The impossibility of review of a ten-day injunction before its expiration and the persistence of the petitioners, both by pursuing the legal questions and by agitating with "continuing activities and programs," foreclosed a holding of mootness.

Having discussed these various components of the mootness doctrine, it remains to relate them to the assault on the "interpretive regulations" of New Jersey's welfare program presently before this Court. In many respects, this is a close case, with the arguments seeming to be nicely balanced.

The employers urge that they are suffering continuing injury from the mere existence of the welfare programs. Unless this argument is accepted, it appears that this case is moot. The only relief sought by the employers that could now be of any use would be a declaratory judgment. Though such a declaration might not be impermissible, the considerations encompassed in the mootness doctrine need be addressed.

■■ Adversity must be judged by an objective standard. Here, absent a continuing injury, the posture of the

---

and remanded the decree of a three-judge district court, but did not hold the case moot. The vacation and remand, however, may well have been motivated by concerns approaching the concreteness element of the mootness doctrine.

Whitcomb v. Chavis, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971), and Roudebush v. Hartke, 405 U.S. 15, 92 S.Ct. 804, 31 L.Ed.2d 1 (1972), arose in Indiana. In *Whitcomb*, a multimember legislative-district plan was in question. Although after the election, the Court proceeded to decide this case because a finding of mootness followed by vacation of the lower court's order might result in the return of the challenged procedure and reinstitution of the lawsuit, which would raise the same issues.

In *Roudebush,* a suit involving the propriety of a state court's ordering a recount in a contest for the office of U. S. Senator, the constitutional issue of who is ultimately to judge the result of the race, the U. S. Senate or the state, remained clearly in contention, barring a finding of mootness.

plaintiffs may not be sufficiently antagonistic. As in Hall v. Beals, *supra,* one who has been injured but will be impaired only in the future if certain speculative contingencies come to pass can no longer properly pursue the litigation. Moreover, the willingness of the state officials adequately to defend policies now threatened, not with an injunction, but only by a declaratory judgment, may be substantially diminished.[15] Having stated this, it is important to note the intervention of the Teamsters Union and the participation, *amicus curiae,* of the Chamber of Commerce of the United States. The presence of these parties does suggest an on-going interest in the issue raised in this litigation.

The procedural posture of this case makes it the antithesis of a "concrete" dispute. No testimony has been taken, no evidence adduced, no findings made. Thus, we are not faced with the prospect of stating that a lengthy trial must go for nought. Rather, we are asked to decide "questions of law" in somewhat of an abstract setting. Moreover, the real possibility of change in the regulations renders this case conjectural.[16]

Finally, we must deal with the contention that this is a government program "capable of repetition, yet evading review." As will be developed, infra, that contention was raised but not met in ITT v. Minter, *supra.* The presence, in that case, of a still active labor dispute raises doubts about the argument that this is a situation capable of evading review. *See* Russo v. Kirby, 453 F.2d 548 (2d Cir. 1971). Nevertheless, cognizant of the time required to perfect appeals both to this Court and to the Supreme Court, review may be unavailable in the majority of cases such as this.

Thus, to avoid holding that this case is moot, it must be found either that this appeal falls into the *Southern Pacific* category, or that the presence of the programs has an on-going direct effect on the appellants.

## II.

The analysis of the mootness doctrine indicates that the persisting vitality of this case turns on two close issues: the "continuing effects" question and the *Southern Pacific* question. A resolution is, however, made simpler by a Supreme Court case, centrally important to determining the answers crucial to this appeal.

In Local No. 8–6, Oil, Chemical and Atomic Workers, Int'l. Union, AFL–CIO v. Missouri, 361 U.S. 363, 80 S.Ct. 391, 4 L.Ed.2d 373 (1960), the union, representing employees of a private company selling natural gas, challenged the constitutionality of a Missouri statutory scheme, referred to as the King-Thompson Act. The Missouri legislation provided that, upon finding certain conditions present, the Governor could seize and operate a privately-owned public utility being struck, and that strikes against such facilities after the takeover would be unlawful. Having struck the gas company, that the Governor then seized, the employees were enjoined from further work stoppages, in accordance with the statutory program. The day after the injunction issued, the strike ended. One month later the underlying labor dispute was resolved and eleven weeks after that, the seizure was terminated. The union continued to appeal the issuance of the injunction and sought a declaration that the Missouri statute was unconstitutional, interfering

15. In *W. T. Grant, supra,* and *Trans-Missouri, supra,* defendants' willingness to defend can be assumed to have been motivated by a desire to avoid the type of relief sought by the government and a fear of subsequent private treble-damage actions, strong motivators indeed.

16. As plaintiff-appellants' complaint and memorandum in support of their motion for preliminary injunction make clear, their challenge is aimed at an interpretative regulation promulgated by defendant-Commissioner. Interpretative regulations are among the most rapidly changing of the oft-changed components of welfare programs.

with the workings of the National Labor Relations Act—the basis of the Supremacy Clause claim both in *Oil Workers* and in the present appeal—and further alleging that there was a violation of the Due Process clause of the Fourteenth Amendment. Although the Missouri Supreme Court adjudicated the union's appeal on the merits, the United States Supreme Court held that the expiration of the injunction and settlement of the labor dispute rendered the case moot.

In Division 1287, Bus Employees v. Missouri, 374 U.S. 74, 83 S.Ct. 1657, 10 L.Ed.2d 763 (1963), the same Missouri statute was challenged, there in the context of a labor dispute unsettled even when the case reached the Supreme Court. The Court, holding *Bus Employees* adjudicable, distinguished *Oil Workers* and Harris v. Battle, 348 U.S. 803, 75 S.Ct. 34, 99 L.Ed. 634 (1954), an earlier case relied on in *Oil Workers,* and stated that the resolution or continuation of the labor dispute was determinative of mootness.

"Reliance for the claim of mootness is placed upon this Court's decisions in Harris v. Battle, 348 U.S. 803, 75 S.Ct. 34, 99 L.Ed. 634, and Oil Workers Unions v. Missouri, 361 U.S. 363, 80 S.Ct. 391, 4 L.Ed.2d 373. In the Oil Workers case the Court declined to consider constitutional challenges to the King-Thompson Act, and in the Harris case declined to rule on the constitutionality of a similar Virginia statute, on the ground that the controversies had become moot. *In both of those cases, however, the underlying labor dispute had been settled and new collective bargaining agreements concluded by the time the litigation reached this Court. Here, by contrast, the labor dispute remains unresolved."* 374 U.S. at 77–78, 83 S.Ct. at 1660 (Emphasis added).

The employers here contend that, despite the settlement of the labor dispute, the present case is not moot. In support of their position they urge that the termination of the strike does not end the injury they suffer, but rather that their ability to bargain collectively with the union when the contract is terminated is hampered by the very existence of the welfare programs. They next claim that, since collective bargaining has been held to be an on-going process,[17] there is still an active dispute to be adjudicated, and that they continue to suffer injury.

The second argument crucial to avoiding dismissal for mootness maintains that this case should be considered in the limited, *Southern Pacific* class of cases "capable of repetition, yet evading review." In *ITT Lamp Division* [18] the Court of Appeals for the First Circuit was presented with a case quite similar to the present one.[19] Responding to the mootness issue, the First Circuit stated that the problem did indeed appear to be "close to the 'recurring question' category," citing *Southern Pacific,* 435 F.2d at

---

17. Our attention has been called to the cases of Fishgold v. Sullivan Drydock & Repair Corp., 328 U.S. 275, 66 S.Ct. 1105, 90 L.Ed. 1230 (1946) and Aeronautical Industrial District Lodge 727 v. Campbell, 337 U.S. 521, 69 S.Ct. 1287, 93 L.Ed. 1513 (1949). Both cases dealt with the rights to reemployment of veterans returning from the Second World War. While it is clear that they can be said to stand for the proposition that collective bargaining is an on-going process, they do not address a problem similar to the one raised here and thus cannot be dispositive of the mootness problem.

18. Appellants point out that the United States Supreme Court denied certiorari in *ITT*, and did not vacate as moot. No conclusions may be drawn from the denial of certiorari. *See* Maryland v. Baltimore Radio Show, Inc., 338 U.S. 912, 70 S.Ct. 252, 94 L.Ed. 562 (1950) (Frankfurter, J.); H. M. Hart & H. Wechsler, The Federal Courts and the Federal System 61 (1953).

19. The First Circuit, finding that there was not a federal preemption and that a balancing of the effects upon each other of the federal-labor and the joint federal-state welfare policies was required, held that this was a role more properly played by the Congress and affirmed the District Court's denial of relief. In view of our disposition of the case, we need not comment further on the First Circuit's actions.

991. The First Circuit, however, did not decide nor was it required to decide whether the issue was within the *Southern Pacific* ambit, for a second case, raising the same labor-welfare challenge, had already been joined on appeal, and in the latter case the strike had not yet been resolved.[20]

*Oil Workers*, however, responds to both questions essential to the employers' argument. In *Oil Workers*, just as in the present case, the threat to strike, labor's principal economic weapon, was affected by a state program. The employees in *Oil Workers* could have contended that their collective bargaining ability had been hindered by their employer's knowledge that a strike could provoke an injunction terminating the work stoppage, without resolving the dispute.[21] The present case would appear to be the obverse of this. Here, the employers can arguably claim that their collective bargaining ability is hindered by the employees' knowledge that a strike might be made more endurable through receipt of welfare benefits.

The Supreme Court, in *Oil Workers*, citing its earlier dismissal of Harris v. Battle, *supra*, squarely rejected both portions of appellants' argument:

"In Harris v. Battle, 348 U.S. 803, 75 S.Ct. 34, 99 L.Ed. 634, these principles were given concrete application in a context so parallel as explicitly to control disposition of the primary issue here. That case originated as an action to enjoin the enforcement of a Virginia statute, markedly similar to the King-Thompson Act, under which the Governor had ordered that 'possession' be taken of a transit company whose employees were on strike. Although the labor dispute was subsequently settled and the seizure terminated, the trial court nevertheless proceeded to decide the merits of the case, holding that the seizure was constitutional. Harris v. Battle, 32 L.R. R.M. 83. The Virginia Supreme Court refused an appeal. Harris v. Battle, 195 Va. lxxxviii. In this Court it was urged that the controversy was not moot because of the continuing threat of state seizure in future labor disputes. It was argued that the State's abandonment of alleged unconstitutional activity after its objective had been accomplished should not be permitted to forestall decision as to the validity of the statute under which the State had purported to act. It was contended that the situation was akin to cases like Southern Pac. Terminal Co. v. Interstate Commerce Comm'n, 219 U.S. 498, 514–516, 31 S. Ct. 279, 55 L.Ed. 310. In finding that the controversy was moot, the Court necessarily rejected all these contentions. 348 U.S. 803, 75 S.Ct. 34, 99 L.Ed. 634. Upon the authority of that decision the same contentions must be rejected in the present case. See also Barker Co. v. Painters Union, 281 U.S. 462, 50 S.Ct. 356, 74 L.Ed. 967; Commercial Cable Co. v. Burleson, 250 U.S. 360, 39 S.Ct. 512, 63 L. Ed. 1030.

361 U.S. at 368–369, 80 S.Ct. at 395.[22]

20. Indeed, Judge Coffin stated, after discussing the *Southern Pacific* doctrine, "In any event, however, the appeal of Maurice Concrete [the appeal joined with *ITT*, in which the dispute had continued] presents the identical question." 435 F. 2d at 991.

The fact that a strike was still in existence at the time the appeal was before the First Circuit indicates that evasion of review is not inevitable.

21. In *Bus Emloyees*, supra, the Court stated that the threat of reinvocation of the seizure act in *Oil Workers* was only speculative. This may well be read to indicate that the detrimental effect on col-lective bargaining because of the "background fears" argument, alone, is not weighty enough to keep alive a controversy.

22. Three Justices dissented in *Oil Workers*. Their dissent, however, was bottomed on the possibility that striking union members might be liable for monetary damages or loss of seniority, a question the majority held not to be properly before the Court. No one expressed any doubts that the resolution of the labor dispute mooted the major issue in the case, the constitutionality of the injunction.

More recent Supreme Court pronouncements on mootness in labor cases have not significantly undercut the *Oil Workers* rule that settlement of the underlying labor dispute, absent special circumstances, requires a holding of mootness. *See* Sears, Roebuck & Co. v. Carpet Layers, 397 U.S. 655, 90 S.Ct. 1299, 25 L.Ed.2d 637 (1970).

In Liner v. Jafco, Inc., 375 U.S. 301, 84 S.Ct. 391, 11 L.Ed.2d 347 (1964), a Tennessee state court enjoined picketing at a building site, and required the contractors who had sought the injunction to post a bond to indemnify petitioners if the injunction were "wrongfully" sued out. The Tennessee Court of Appeals, finding that the construction at the site had been completed, dismissed the enjoined picketers' challenge as moot. The U. S. Supreme Court, holding that mootness is a federal question, considered the issues raised by the petitioners. The Court held that the petitioners, whose federally protected rights might have been abridged, and for whose benefit the bond had been posted, had a substantial continuing stake in the litigation both because their rights had already been transgressed and because provision had been made to redress such deprivation if found unlawful. In the case now pending, such considerations are not present. Moreover, state court interference with labor problems arguably within the exclusive jurisdiction of the NLRB is a matter which the Supreme Court held particularly important previously, and therefore felt compelled to adjudicate the case.

The cases discussed in Part I of this opinion, while perhaps indicating some lessening of the mootness stricture, do not appear to affect the viability of *Oil Workers* in a labor context. If *Oil Workers* is to be found not harmonious with the current contours of the mootness doctrine, that decision should, and perhaps must, be made by the U. S. Supreme Court.

■ The *Oil Workers* case requires that we dismiss this appeal. The lack of

immediacy and solidity of interest necessary to support jurisdiction is reflected here in the atmosphere of abstraction, ambiguity, and conjecture surrounding this matter. Accordingly, we now dismiss this appeal as moot with directions to the district court, on remand, to vacate and dismiss for the same reason. *See* United States v. Munsingwear, 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950). *Cf.* Socialist Labor Party v. Gilligan, 406 U.S. 583, at 592–593, n. 3, 92 S.Ct. 1716, 32 L.Ed.2d 317. (Douglas, J. dissenting).

■ This disposition is consonant with a proper appreciation of the role of the federal judiciary when asked to decide the constitutionality of state statutes and programs. In such cases, our task does not involve conjuring up situations to preserve an otherwise quiescent issue, nor does our assignment include constitutional adjudication unless such is necessarily implicated in the decision of a case or controversy squarely before the Court. *See* Ashwander v. TVA, 297 U.S. 288, 346–348, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J. concurring). Because we act only when required, can we legitimately act at all. The issue presented to the Court is now moot, therefore, we must stay our hand.

An order will be prepared, remanding the case to the District Court for disposition consistent with this opinion.

GIBBONS, Circuit Judge (dissenting).

This is an appeal from a dismissal by the district court pursuant to Rule 12(b)(6), Fed.R.Civ.P., for failure to state a claim upon which relief may be granted. The appellants are two New Jersey corporations engaged in the tire sales and service business. According to the complaint, all their production and service employees are represented by the intervenor defendant, Teamsters Local Union No. 676. On May 14, 1971, upon the expiration of a collective bargaining agreement which had been in effect since May 15, 1968, the local struck as a

result of the parties' failure to reach a new agreement. According to the complaint, that strike was still in progress when the complaint was filed on June 10, 1971. The only hearing was that held on June 24, 1971. That hearing was on the plaintiffs' motion for a preliminary injunction, in support of which the plaintiffs were prepared to offer testimony. At the hearing the intervening defendant, Local Union No. 676, was permitted to intervene; the Attorney General, representing the public official defendants, was permitted to make an oral motion to dismiss for lack of jurisdiction under 28 U.S.C. § 1337, upon which the court never ruled. The intervening defendant was permitted to make an oral motion to dismiss for failure to state a claim upon which relief may be granted. In advancing the Rule 12(b)(6) motion, counsel for the local relied upon the opinion of the First Circuit in ITT Lamp Division v. Minter, 435 F.2d 989 (1st Cir. 1970), cert. denied, 402 U.S. 933, 91 S.Ct. 1526, 28 L. Ed.2d 868 (1971); although, as that opinion makes clear, the district court decision reviewed was the denial of a preliminary injunction after an evidentiary hearing. The district court below declined to take testimony, and dismissed solely upon the basis of the allegations in the complaint. Thus, assuming that the case is still justiciable, our review would be confined to the legal sufficiency of the allegations of the complaint, in particular the allegations in paragraph 14:

> "Plaintiffs believe and therefore aver that the payment by the State of New Jersey through its instrumentalities and political subdivisions, pursuant to the aforesaid interpretative regulation, of public assistance and public welfare benefits to individuals and the families of individuals who voluntarily leave their employment to directly engage in and actively participate in an economic strike against their employer, interferes with and infringes upon free collective bargaining as guaranteed to Plaintiffs by Congress under the Labor-Management Relations Act of 1947, as amended, 29 U.S.C. § 141 et seq.; constitutes an intrusion by the State of New Jersey into the field of labor-management relations which Congress has pre-empted and occupied to the full extent of its powers; and, accordingly, violates Article VI, Clause 2 of the Constitution of the United States."

At the hearing the plaintiffs were prepared to offer testimony in support of their claim that the availability of welfare benefits for strikers did in fact interfere with and infringe upon free collective bargaining. The absence of such proof at the hearing upon the preliminary injunction was relied upon by the *Minter* court as one reason, among others, for affirming the denial of a preliminary injunction in that case. Here, the plaintiffs were prepared to offer such evidence, but the court ruled that the complaint failed to state a cause of action. Reading the complaint as a whole, and particularly paragraph 14, it is perfectly clear that the gravamen of the charge is that the *availability* of strike benefits adds the economic power of the state to the union side, and thereby interferes with the *collective bargaining relationship*.

Thus, this controversy is moot only (1) if welfare benefits to strikers are no longer available, or (2) if there is no longer a collective bargaining relationship which can be affected by such availability. It is clear from the briefs filed on behalf of the public defendants that welfare benefits are still available to strikers in New Jersey, and that the state has no present intention of changing its policy with respect to such payments. Thus, the only basis upon which this controversy may be classified as moot is a finding that there is no longer a collective bargaining relationship which can be affected by the acknowledged continued availability of welfare benefits for strikers.

Since no testimony was taken in the district court, the record is almost total-

ly devoid of any facts with respect to the actual status of the collective bargaining relationship. The judges in the majority act upon the conflicting representations of counsel as to the date of termination of the strike. The opinion states:

> "The union states that the strike 'ended immediately prior to the June 24, 1971 hearing.' The employers allege that the 'employees did not return to work until June 28, 1971.' Under either factual situation, a new contract having been accepted and ratified, it is clear that the labor dispute undergirding this challenge to the New Jersey programs had been concluded before the trial judge dismissed the action and long before appeals were filed or argued in this Court." (footnote omitted)

With deference, it is a long logical leap from the very little information furnished to us upon which counsel agree, and the conclusion drawn by the majority. Among the unanswered questions are these:

A. There is a contract, but is it of long or short duration?

B. If it is of short duration, will collective bargaining over terms of its renewal, extension or modification continue while it is in effect?

C. Whether it is of long or of short duration, does it have a binding grievance/arbitration and no-strike provision, or is the union free to strike over grievances?

D. Will the availability of welfare benefits to strikers have any effect upon the bargaining relationship in any of the above situations?

The plaintiffs vigorously assert that the bargaining relationship is still affected by the availability of strike benefits. If the record established that the parties were in year one of a three-year labor contract with a no-strike clause, I would agree that the controversy might be too speculative to warrant decision. Short of that situation, the impact on the collective bargaining relationship of the availability of welfare benefits to strikers may be quite real and immediate. But we simply do not know what the situation is because the plaintiffs were deprived of the opportunity of making a record in the district court. The analytical unsoundness of the majority's position is reflected in its reliance, in support of its mootness conclusion, on that very deprivation. The opinions states:

> "The lack of immediacy and solidity of interest necessary to support jurisdiction is reflected here in the atmosphere of abstraction, ambiguity, and conjecture surrounding this matter."

If there is abstraction and ambiguity it arises from the absence of a record. If there is conjecture, the conjecture is by the majority of this panel. Their conclusion that there is no collective bargaining relationship which may be affected by the availability of welfare benefits to strikers is entirely conjectural. Appellate decision making cannot be reduced to scholastic disputation about rules to be drawn from previously decided cases. It must first of all be grounded in facts. There is no more justification for making a hypothetical or conjectural decision upon an issue of alleged mootness than upon an issue going to the merits.

This case can be regarded as having been made moot by the termination of the strike only if we construe the complaint as addressed to the protection of the integrity of the collective bargaining relationship only during the pendency of a strike. But it cannot fairly be so construed. Collective bargaining over contract terms more often than not goes on for months before a strike. Collective bargaining over grievances may go on continuously. The complaint seeks to

unfetter the collective bargaining relationship from alleged interference by New Jersey. The relationship for which the protection of the court has been sought is a continuing one. *See* NLRB v. Newark Morning Ledger, 120 F.2d 262, 267 (3d Cir.), cert. denied, 314 U.S. 693, 62 S.Ct. 363, 86 L.Ed. 554 (1941).

In the context of the protection of a continuing relationship perhaps only two of the many decisions discussed in the majority opinion are relevant, Fishgold v. Sullivan Drydock & Repair Corp., 328 U.S. 275, 66 S.Ct. 1105, 90 L.Ed. 1230 (1946); Bus Employees v. Missouri, 374 U.S. 74, 83 S.Ct. 1657, 10 L.Ed.2d 763 (1963).

In *Fishgold* a veteran was laid off by his employer in compliance with the seniority provisions of a collective bargaining agreement. He sued the employer for damages and for a declaratory judgment that his layoff was in violation of Section 8(c) of the Selective Training and Service Act of 1940, 50 U.S.C.App. § 301. The labor union intervened, taking a position in defense of the validity of contract seniority provisions. The district court awarded money damages to the veteran, and only the union appealed. Meanwhile, the one-year statutory veteran's preference period for the original veteran plaintiff's employment had expired. The Supreme Court held that the union, because of the ongoing relationship between it and the employer by virtue of the labor contract, had standing to appeal. Since the contract was still in existence, the case was not moot. *Fishgold* is, of course, only authority for the instant case by way of analogy. But the analogy is closer than in any of the cases upon which the judges in the majority rely.

*Bus Employees*, as the majority opinion points out, dealt with the validity of a Missouri statute which gave the governor of that state the authority to seize the facilities of a public utility in the event of a strike, and to operate them in the public interest. The statute was challenged on the same basis as is the New Jersey regulation on welfare benefits to strikers challenged here, interference with a relationship regulation of which has been preempted by paramount federal law. While the case was on appeal the governor terminated the seizure. Missouri then urged mootness, relying on Oil Workers Unions v. Missouri, 361 U.S. 363, 80 S.Ct. 391, 4 L.Ed.2d 373 (1960), a case involving the identical statute. The Court declined to dismiss as moot, and held the Missouri statute unconstitutional. It distinguished *Oil Workers* because in that case both the labor dispute and the seizure had ended, whereas in *Bus Employees* the strike had not ended and the availability of the seizure device as an available means of terminating it had an ongoing effect. *Bus Employees*, again, is only analogous authority since the plaintiffs sought the protection of the right to strike, a right lawful under the National Labor Relations Act which Missouri attempted to make unlawful. But on the mootness issue the case is quite closely in point, for it recognizes that the availability of state interference can have an ongoing effect upon the collective bargaining relationship, and that a controversy over such availability is not moot, as long as the affected relationship exists.

The issues in this case are of considerable public interest, and likely to recur. Overanxiety on the part of the federal courts to find such cases non-justiciable is not consistent with our judicial obligations. As Judge Coffin said in a similar context:

"Although the strike against ITT was subsequently settled, the issue, we know from our own experience, has earlier vainly sought appellate review in this circuit and is likely again to be raised, bringing it close to the 'recurring question' category, where significant public rights are involved and court review ought not, if possible, be avoided. *See* So. Pac. Terminal Co. v. I.C.C., 219 U.S. 498, 515–516, 31 S.Ct. 279, 55 L.Ed. 310 (1911) and Marc-

hand v. Director, U. S. Probation Office, 421 F.2d 331 (1st Cir. 1970)." ITT Lamp Division v. Minter, *supra*, 435 F.2d at 991.

We cannot without a record properly hold that this case is moot. At the same time, since there is no record, we cannot rule out the possibility that the situation of the parties has so changed as to render the case moot. The issues involved are complex and their proper resolution far from clear. *Compare* ITT Lamp Division v. Minter, *supra*, *with* John Hancock Mutual Life Insurance Co. v. Commissioner of Insurance, 349 Mass. 390, 208 N.E.2d 516 (1965). I would remand the case to the district court for a hearing to determine first, the actual collective bargaining relationship between the parties, and next, in what way, factually, that actual relationship is affected, if at all, by the availability of welfare benefits to strikers. Only with such a record can we properly decide if there is still a genuine case or controversy, and if so, how it should be resolved.